IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ROBERT J. STIETZ,

                Plaintiff,                OPINION AND ORDER

v.

                                            19-cv-43-wmc

JOSEPH J. FROST and
NICK WEBSTER,

                Defendants.

     In this case, plaintiff Robert Stietz brings suit against two Wisconsin Department of Natural Resources ("DNR") wardens, Joseph Frost and Nick Webster. Stietz alleges that defendants Frost and Webster violated his Second and Fourth Amendment Rights when they entered his property, demanded that he give up his rifle, and then seized both him and his rifle. Defendants have now moved to dismiss plaintiff's case for failure to state a claim. For the reasons discussed below, the court will grant defendants' motion and dismiss the case.

ALLEGATIONS OF FACT

     At the outset, the court must address defendants' argument that the court take judicial notice of the proceedings and findings of fact in *State v. Stietz*, 2017 WI 58, 375 Wis. 2d 572, 895 N.W.2d 796. That case involved the criminal prosecution of Stietz for his actions during the same event that forms the basis of the present lawsuit. After his initial conviction by a jury for resisting/obstructing a law enforcement officer and intentionally pointing a firearm at an officer, the Wisconsin Supreme Court awarded Stietz a new trial, finding that a jury instruction on self-defense was wrongly denied him and not

harmless. Rather than re-try the case, however, Stietz pled no contest to a charge of resisting or obstructing a law enforcement officer. According to defendants, the court should take notice of these previous proceedings, as well as the findings of fact found in them. Indeed, defendants' summary of the facts cites not to plaintiff's complaint, but rather to the Wisconsin Supreme Court's findings of facts in Stietz's criminal case. While plaintiff also cites to portions of the Wisconsin Supreme Court's opinion in his complaint, he objects to the defendant's suggestion that any facts outside of those alleged in his complaint should be judicially noticed. (Pl.'s Opp'n (dkt. #9) 10.)

Typically, when considering a motion to dismiss for failure to state a claim, a court must consider only those facts alleged in the complaint. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) ("As a general rule, on a Rule 12(b)(6) motion, the court may consider only the plaintiff's complaint."). As defendants rightly point out, however, a court may under some circumstances take judicial notice of certain matters of public record not contained within the complaint. *See Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). In particular, "[a] court may take judicial notice of an adjudicative fact that is both 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evidence 201(b)). Because judicial notice "substitutes the acceptance of a universal truth for the conventional method of introducing evidence," however, the Seventh Circuit understandably advises courts to exercise caution in employing this adjudicative device. *Id.*

Here, the existence of the previous case, its procedural history, and the fact that Stietz pled no contest to resisting or obstructing an officer are all facts that are not reasonably disputed and ascertainable from a source whose accuracy cannot be reasonably questioned. *See Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996) (court may take judicial notice of existence and outcome of related administrative proceeding); *Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) (taking judicial notice of judge's ruling in prior proceeding involving the same litigant).

Defendants urge the court to go a step further and take judicial notice of the underlying findings of fact made by the Wisconsin Supreme Court. (*See* Defs.' Br. (dkt. #4) 8-10.). Previous cases have held that underlying findings of fact made by a previous court, unless indisputable, are not the proper subject of judicial notice. *See Tobey v. Chibucos*, 890 F.3d 634, 648 (7th Cir. 2018) (findings of fact from previous court records were subject to reasonable dispute and were not proper subject of judicial notice); *Gen. Elec. Capital Corp.*, 128 F.3d at 1080 (same); Wright & Miller, 21B Fed. Prac. & Proc. Evid. § 5106.4 (2d ed.) ("[M]ost courts agree that Rule 201 does not permit courts to judicially notice the truth of findings of fact."). Here, the underlying judicial findings of fact cited by defendants are not "indisputable" -- indeed, they were the subject of a contested criminal trial and plaintiff has expressed disagreement with several of the facts cited by defendants. (*See* Pl.'s Opp'n (dkt. #9) 10.)

Defendants suggest that plaintiff's citation to the Wisconsin Supreme Court's opinion in his complaint incorporates the findings into his allegations. (Defs.' Br. (dkt. #4) 9.) For support, defendants point to *Menominee Indian Tribe of Wisconsin v. Thompson*,

3

161 F.3d 449 (7th Cir. 1998), which held that documents referred to in a complaint and central to its claims are considered part of the pleadings. *Id.* at 456. There, the Menominee Indian Tribe of Wisconsin sought a declaration of its rights as set forth in a series of treaties. *Id.* at 452. The court held that, because the complaint referenced the treaties and were central to the claims at issue, judicial notice of the treaties was proper. *Id.* at 456. Here, by contrast, the previous criminal case is *not* central to plaintiff's claim. *Cf. EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 779 (7th Cir. 2007) (facts alleged in EEOC charge were not central to EEOC complaint even though charge was attached to the complaint). While the underlying facts may overlap, plaintiff's claims stand on their own even without reference to the previous proceedings. This certainly cannot be said of the treaties at issue in the *Menominee* case, which specifically sought a declaration of the rights enumerated within the treaties. *Menominee*, 161 F.3d at 452.

 Having said that, the Wisconsin Supreme Court's majority opinion in *State v. Stietz* did set forth a set of facts established at trial viewing "the evidence from the defendant's perspective." 2017 WI ¶¶ 23-60. Although remanding for a new trial because of a legal error, and ultimately allowing defendant to plead no contest to the lesser of the two charges, to resisting/obstructing an officer, the defendant would seem to at least be estopped from asserting facts here that were *more* favorable than the most favorable before the Wisconsin courts. *Cf. DeGuelle v. Camilli*, 724 F.3d 933, 935 (7th Cir. 2013) (doctrine of collateral estoppel precluded plaintiff from alleging claims inconsistent with Wisconsin court decision finding no tax fraud). Regardless, he may not now take a position that would be inconsistent his criminal plea, *see Heck v. Humphrey*, 512 U.S. 477, 487 (1994)

4

(requiring dismissal of a suit that "would necessarily imply the invalidity of [the plaintiff's] conviction or sentence"), although at least arguably none of the claims here would necessarily require the invalidity of his no contest plea of resisting or obstructing a law enforcement officer, *see Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010) (explaining how conviction for resisting arrest is not incompatible with Fourth Amendment claims); *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 764 (7th Cir. 2008) (same).

Accordingly, in considering defendants' motion, the court will generally look only to facts alleged in plaintiff's complaint, and not to the findings of fact in the related criminal case unless wholly inconsistent with the Wisconsin Supreme Court's factual findings. In so doing, the court takes all of the factual allegations in the complaint as true and draws all inferences in plaintiff's favor again subject to this narrow limitation. *Killingsworth v. HSBC Bank Nev.*, 507 F.3d 614, 618 (7th Cir. 2007).

Turning now to those facts, on the afternoon of November 25, 2012, plaintiff Stietz set out to inspect a 25 acre piece of property that he and his wife owned in rural Lafayette County, Wisconsin, which is surrounded by his uncle's land, over which he was given an easement to a nearby Highway 81. With gun hunting season for deer ending that day at 4:45pm, the purpose of Stietz's inspection was to see if any hunters or others were trespassing on his land, as had happened in previous deer seasons, as well as to ascertain any damage to the fence line around his property. Parking his car near the gate to his land about a quarter of a mile from Highway 81, Stietz began walking his property, carrying a loaded rifle, along with a pistol in his pants waistband.

5

Shortly after, DNR wardens Frost and Webster were driving on Highway 81 near Stietz's property, and spotted Stietz's parked car "a few minutes before the end of hunting season." (Compl. (dkt. #1-1) ¶ 10(a).) According to Stietz, they saw "no violations of any Wisconsin law nor any persons in the vicinity," (*id.* ¶ 10(b)), yet still decided to proceed through the gate into Stietz's property, without invitation or consent. "Within minutes" of entering the property, defendants Frost and Webster heard someone approaching. (*Id.* ¶ 12.) By this time of day in late fall, it was already completely dark, and they both shone bright long flashlights at the approaching person, who turned out to be Stietz. In the dark, Stietz was not able to see any DNR identification on Frost's or Webster's blaze clothing, nor was he able to hear or understand any statements they may have made to identify themselves as wardens. However, Stietz apparently did hear enough to respond to a question that he had seen several doe while walking on the property, although he was not hunting.

At that point, apparently believing that Stietz had been hunting for deer based on that response and the blaze orange sticking out of Stietz's coat pocket, either Frost or Webster then told Stietz to give up his rifle to them. Believing them to be trespassers, Stietz said, "no." Continuing to approach him defendants made further demands for the rifle, and once close enough, one of them grabbed him by the jacket. Frost then grabbed the rifle, and both Frost and Webster struggled with Stietz to gain hold of the rifle. Frost ultimately pulled the rifle from Stietz, but in doing so, fell backwards onto the ground. Webster then pulled his pistol and pointed it at Stietz, at which point both Stietz and Frost also pulled their pistols. While defendants yelled to Stietz to drop his gun, he told

6

them to drop theirs first. During the ensuing stand-off, one of defendants contacted the Lafayette County Sheriff's office. After a deputy sheriff arrived, further negotiations occurred until Stietz finally agreed to put down his weapon and was arrested.

Stietz was then charged with several crimes, convicted of resisting/obstructing an officer, and incarcerated for one year. After appeal of his conviction to the Wisconsin Supreme Court, he was awarded a new trial, but instead opted to plead no contest. He now claims in this civil suit that defendants violated his Fourth Amendment rights to be free of unlawful search and seizure and his Second Amendment right to bear arms. (*Id.* ¶¶ 41, 48.) In response, defendants moved to dismiss plaintiff's complaint in its entirety. (Defs.' Br. (dkt. #4) 2-3.)

## OPINION

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. In doing so, the court must "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak v. City of Chi.*, 810 F.3d 476, 480-81 (7th Cir. 2016).

Here, defendants argue that plaintiff has failed to state a claim upon which relief can be granted, and regardless, that they are protected from suit by qualified immunity. The court will address plaintiff's Fourth and Second Amendment claims separately.

I. **Fourth Amendment**

Plaintiff claims that both Frost and Webster violated his Fourth Amendment rights when they: (a) entered his property without invitation or consent (Compl. (dkt. #1-1) ¶ 11); and (b) conducted an "illegal, unreasonable and warrantless seizure of Plaintiff's rifle and his body" (*id.* ¶¶ 27, 34). The court will address those actions in turn.

A. **Entry into Property**

According to defendants, case law definitively precludes plaintiff's claim that Frost and Webster violated the Fourth Amendment when they entered his property without consent. (Defs.' Br. (dkt. #4) 16.) The court agrees that, even drawing all reasonable inferences in plaintiff's favor, defendants' entry onto Stietz's property did not amount to a Fourth Amendment violation under the "open fields doctrine."[1]

By its terms, the Fourth Amendment protects individuals only "in their persons, houses, papers, and effects," U.S. Const. Amend. IV, and the United States Supreme Court has long held that the "special protection accorded by the Fourth Amendment to the people in their persons, houses, papers, and effects, is not extended to the open fields." *Hester v. United States*, 265 U.S. 57, 59 (1924). Under this "open fields doctrine," the Fourth Amendment does not preclude an officer from trespassing on private, undeveloped land outside of the curtilage of a home. *See United States v. Sweeney*, 821 F.3d 893, 900 (7th Cir. 2016); *United States v. Dunn*, 480 U.S. 294, 300 (1987).

---

[1] Having reversed on other grounds, the majority of the Wisconsin Supreme Court declined to reach Stietz's defense of trespass, *Stietz*, 2017 WI ¶ 4 n.5, while the dissenters disagreed on the application of the "open field doctrine," *id.* ¶¶ 92, 148-50.

8

For example, in *Oliver v. United States*, 466 U.S. 170 (1984), the Supreme Court applied the open fields doctrine in holding that two state narcotics agents did not violate the Fourth Amendment when they entered an individual's private land, despite the fact that the individual did not consent to their entry and the agents had neither a warrant nor probable cause. *Id.* at 173 & n.1. Moreover, the property owner had "posted 'No Trespassing' signs at regular intervals," and the land was "highly secluded" and "bounded . . . on all sides by woods, fences, and embankments." *Id.* at 174. The Court indicated that the open fields doctrine established a categorical rule, rejecting a "case-by-case approach" as an unworkable "accommodation between the needs of law enforcement and the interests protected by the Fourth Amendment." *Id.* at 181.

Here, the defendants were driving Highway 81 at dusk looking for hunters who might have refused to call an end to gun hunting for deer in violation of Wisconsin law. Spotting an abandoned car in the middle of an open field, the wardens went to inspect it, and finding an empty rifle case and deer scent, among other suspicious materials, proceeded to look for a hunter belonging to that car. *Stietz*, 2017 WI at ¶¶ 32-34. None of plaintiff's alleged facts distinguish this case from *Oliver*, and plaintiff fails in his opposition brief to offer a cogent argument to defend his claim as to this issue, focusing instead on whether or not a "seizure" occurred. (*See* Pl.'s Opp'n (dkt. #9) 3-9.) Accordingly, even taking all of plaintiff's allegations as true, the court concludes that under the open fields doctrine, plaintiff failed to state a claim of a Fourth Amendment violation on the basis of defendants' entry onto his land.

Finally, even if this issue were open to reasonable debate, the "doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A qualified immunity defense has two prongs: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (quoting *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2016)). "[C]ourts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson*, 555 U.S. at 236). "A clearly established right is one that is sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Mullenix*, 136 S. Ct. at 308 (internal citations and quotations omitted). While "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. For all the reasons identified, plaintiff's asserted Fourth Amendment claim is far from clearly established. Thus, defendants at least have qualified immunity from any claim by plaintiff to an award of monetary damages.

## B. Seizure

Defendants further argue that plaintiff's allegations fail to support a Fourth Amendment claim for the seizure of Stietz or his rifle. (*See* Defs.' Br. (dkt. #4) 16.) In particular, they argue that when the wardens encountered Stietz, their brief stop of him

10

was reasonable under the circumstances. (*Id.* at 25.) They further argue that they were entitled to secure his loaded rifle during a lawful stop to protect their safety. (*Id.* at 27.) In response, plaintiff argues primarily that his "well-pleaded facts show there was a seizure of Plaintiff's person and his effects." (Pl.'s Opp'n (dkt. #9) 4.) Yet this is not in dispute. (*See generally* Defs.' Br. (dkt. #4) 20-28; Defs.' Reply (dkt. #11) 6 ("Defendants do not contest that a 'seizure' occurred.").) Rather, the relevant question is whether the seizures at issue violated the Fourth Amendment.

The Constitution does not forbid all searches and seizures, but rather only those that are "unreasonable." *See Elkins v. United States*, 364 U.S. 206, 222 (1960). In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that officers may conduct a brief, investigatory stop if they have reasonable suspicion that an individual has, or is about to, commit a law violation. *Id.* at 20-22. "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal citations and quotations omitted). In order to justify a *Terry* stop, an officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

Here, even viewed in the light most favorable to plaintiff, he has not alleged sufficient facts to support his claim that defendants' initial stop of Stietz lacked reasonable suspicion. Plaintiff's complaint and the Wisconsin Supreme findings of fact establish that Stietz was: (1) found alone, on farm land suitable for hunting, albeit his own land; (2)

11

carrying a deer hunting rifle that he acknowledges was loaded; (3) wearing a coat with an orange-hunting vest sticking out of his pocket; and (4) near a car defendants had only shortly before inspected and found had an empty gun case, deer scent-killer spray and a camouflaged tree seat. (*See* Compl. (dkt. #1-1) ¶¶ 10, 12; *Stietz*, 2017 WI ¶¶ 33-44.) Based on these objective and particularized facts, it was reasonable for defendants to suspect that Stietz was either hunting, or about to hunt, deer just after the end of gun season, which is a violation of Wisconsin law. *See* Wis. Stat. § 29.971(11).

Plaintiff emphasizes in his complaint and his brief that defendants did not actually see a violation of Wisconsin law. (Compl. (dkt. #1-1) ¶¶ 10(b), 11; Pl.'s Opp'n (dkt. #9) 4.) As noted above, however, proof of actual wrongdoing is not required to support reasonable suspicion. *See Navarette*, 572 U.S. at 397. Plaintiff also argues somewhat confusingly that if defendants concede that Stietz was unaware that Frost and Webber were DNR wardens, "then they would lose any chance to contend they were operating under the *Terry* 'reasonable suspicion' doctrine." (Pl.'s Opp'n dkt. #9) 7-8.) However, there is no simply support for the proposition that an officer cannot conduct a lawful *Terry* stop if the suspect does not understand that the detainer is an officer, so this argument has no merit. Finally, plaintiff points to various Wisconsin statutes to support the proposition that Wisconsin law only permits a *Terry* stop on public land. (Pl.'s Br. (dkt. #9) 7.) As defendants point out, however, "state law does not control the reasonableness inquiry under the Fourth Amendment." *Jackson v. Parker*, 627 F.3d 634, 640 (7th Cir. 2010) (citing *Virginia v. Moore*, 553 U.S. 164, 176 (2008)). Moreover, as discussed above, officers are not prohibited by the Fourth Amendment from entering open fields, even if private, to

pursue reasonable suspicion that a crime has been committed. *See Hester*, 265 U.S. at 59; *Oliver*, 466 U.S. at 174. And, again, Stietz's claims are barred by qualified immunity because plaintiff has not demonstrated that the allegedly unconstitutional stop violated a "clearly established right."

Still, just because defendants' original stop was justified at its *inception*, does not mean that defendants' subsequent actions did not violate the Fourth Amendment. *See Terry*, 392 U.S. at 17-18 ("This Court has held in the past that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope."). Here, plaintiff contends that the seizure of his rifle and the ensuing struggle and standoff were also violations of the Fourth Amendment. (Pl.'s Opp'n (dkt. #9) 7.) *First*, defendants point to various cases holding that the Fourth Amendment does not prohibit an officer from temporarily seizing a firearm during a lawful stop. For example, in *Terry*, the Supreme Court found no Fourth Amendment violation where the officer disarmed a suspect upon discovering a revolver after a valid stop and limited pat down search. 392 U.S. at 29-30. Similarly, in *Adams v. Williams*, 407 U.S. 143 (1972), the Supreme Court held that a police officer did not violate the Fourth Amendment where he stopped an individual based on reasonable suspicion, then reached into the suspect's waistband and seized a pistol. *Id.* at 145, 148. In each case, the Court recognized that an officer "making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect" and concluded that an officer may conduct a limited protected search for weapons, *regardless* of whether the possession of the weapon is lawful. *Id.* at 146. While defendants also cite to numerous other cases similarly holding

13

that the Fourth Amendment does not preclude the protective seizure of a firearm (Defs.' Br. (dkt. #4) 22-23), plaintiff makes *no* effort to rebut any of defendants' specific arguments or citations on this issue. The "touchstone" of a Fourth Amendment inquiry is "the reasonableness in all the circumstances" of the officer's conduct, *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (per curiam) (quoting *Terry*, 392 U.S. at 19), and here plaintiff had admitted to having a loaded rifle, in nearly completely darkness, and refused to give up his rifle despite being repeatedly asked to do so. Even viewing these facts in the light most favorable to plaintiff, as the Wisconsin Supreme Court did in *Stietz*, this court cannot find plaintiff's allegations support a claim that defendants' disarming of Stietz was unreasonable, especially given the sizeable and persuasive case law finding a temporary seizure of a weapon during an investigatory stop to be reasonable and compatible with the Fourth Amendment. Accordingly, plaintiff's allegations regarding the seizure of his rifle do not state a claim for a Fourth Amendment violation, and even if it did, monetary damages would be unavailable under the qualified immunity doctrine.[2]

*Second*, defendants maintain that their other actions, including pointing their pistols at Stietz and the ensuing standoff, were reasonable and not violative of the Fourth Amendment. While courts have ruled that the Fourth Amendment's prohibition on unreasonable seizures also protects citizens from "excessive force," such claims must also be analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "[C]areful attention to the facts and circumstances of each particular

---

[2] Whether or not the seizure implicates the Second Amendment is discussed more fully in the following section.

case" are required, and the "reasonableness" of an officer's action "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," as well as the "clearly established" rights. *Id.* at 396. Relevant circumstances may include the time of day, the reaction of the suspect, the location of the stop, and the nature of the crime under investigation. *See United States v. Ocampo*, 890 F.2d 1363, 1369 (7th Cir. 1989). Under this standard, defendants argue that *Ocampo*, 890 F.2d 1363, supports finding their actions reasonable under all the circumstances. In *Ocampo*, an officer drew his gun and pointed it at a suspect, just as he approached a vehicle during an investigatory stop for suspected drug trafficking activity. *Id.* at 1366, 1369. The court held that the "limited use of his weapon was a reasonable precaution in the context of an investigatory stop." *Id.* at 1370.

Once again, plaintiff has pleaded insufficient facts to support a claim that defendants' actions were unreasonable under the circumstances. To the contrary, he acknowledges that it was dark out, a number of factors gave rise to the warden's suspicion as to his possible illegal conduct, *and* he refused to give up his admittedly loaded rifle, after being asked more than once to do so. Plaintiff also acknowledges that a struggle ensued between himself and the defendants, resulting in Warden Frost going to the ground. Although the court must view the alleged facts in the light most favorable to plaintiff, it must also consider the circumstances from the perspective of an objective officer on the scene. So viewed, the court cannot conclude that defendants' actions -- including pointing their pistols at Stietz -- were objectively unreasonable. Thus, plaintiff has failed to state a

15

Fourth Amendment violation or alleged grounds that would support an award of monetary damages here.

## II. Second Amendment

Defendants next argue that plaintiff fails to state a viable Second Amendment claim. (Defs.' Br. (dkt. #4) 11.) Specifically, according to defendants, "no court has held that the Second Amendment applies when law enforcement temporarily seizes a firearm" (*id.*), nor does plaintiff point to any such case that specifically contradicts this assertion. Rather, plaintiff simply argues that Second Amendment case law generally supports his claim. (Pl.'s Opp'n (dkt. #9) 9.) As an initial matter, although defendants frame the issue as a "temporary" seizure, no facts in the complaint indicate how long defendants retained Stietz's rifle or whether it was returned at all. Accordingly, the court must generally consider whether Frost's and Webster's seizure of Stietz's rifle amounts of a violation of the Second Amendment.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. In a landmark decision, the U.S. Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. However, the *Heller* court also specified that this right is "not unlimited." *Id.* at 595. Two years later, the Court also applied this right to the states in *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

Even so, both *Heller* and *McDonald* involved challenges to gun-control statutes or ordinances, not directly to an individual's right to a particular firearm. Indeed, "[w]hether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue that is just beginning to receive judicial attention." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir. 2014). So, too, the Seventh Circuit has not specifically held that the seizure of a particular firearm by law enforcement constitutes a violation of the Second Amendment, although it has also not foreclosed such a possibility. *See id.*; *Pierner-Lytge v. Mitchell*, 412 F. Supp. 3d 1012, 1020-21 (E.D. Wis. 2019) ("In the Seventh Circuit, it is an open question whether the Second Amendment encompasses the right to possess a specific firearm.").

Regardless, plaintiff advances only a brief and general case for extending the Second Amendment to the facts alleged in his complaint. He first points out that both *Heller* and *McDonald* emphasized the right of self-defense, which both decisions emphasized was "central" to the Second Amendment. *Heller*, 554 U.S. at 599; *McDonald*, 561 U.S. at 767. Plaintiff next cites to *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), which held that the right to self-defense extends beyond the home and, therefore, an Illinois statute prohibiting the carrying of guns in public violated the Second Amendment. *Id.* at 942. However, plaintiff does *not* discuss or acknowledge the fact that neither case involved an individual's right to a particular firearm, as opposed to gun-control statutes. As a result, plaintiff fails to grapple with salient problems in extending existing Second Amendment jurisprudence to individual seizures of firearms. Such an extension "implicates not only the individual's

17

right to possess a firearm, but the ability of the police to take appropriate action when they are confronted with a firearm that *may or may not* be lawfully possessed, and which, irrespective of the owner's right to possess the firearm, may pose a danger to the owner or others." *Sutterfield*, 751 F.3d at 572 (emphasis added).  Also, some courts have suggested that the seizure of *one* firearm does not necessarily interfere with Second Amendment interests at all, because such a seizure does not prohibit the individual from retaining or acquiring other firearms.  *See, e.g.*, *Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011); *Bane v. City of Philadelphia*, 2009 WL 6614992 (E.D. Pa. June 18, 2010); *Garcha v. City of Beacon*, 351 F.Supp.2d 213 (S.D.N.Y. 2005).  As the Seventh Circuit acknowledged in *Sutterfield*, this issue "is a sensitive one," 751 F.3d at 572, and given the limited argument proffered by plaintiff, this court is reluctant to break new ground, nor does it need to, as defendants' qualified immunity defense once again provides an even stronger basis for precluding any award of monetary damages in this case.

## ORDER

IT IS ORDERED that defendants' motion to dismiss (dkt. #3) is GRANTED.

Entered this 9th day of July, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge
